# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Mitsubishi Motors North America, Inc.,<br>    4031 Aspen Grove Drive, Suite 700,<br>    Franklin, Tennessee 37067 | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| BNSF Railway Company,<br>    2650 Lou Menk Drive<br>    Fort Worth, TX 76131; | ) ) ) ) | Case No. |
| CSX Transportation, Inc.,<br>    500 Water Street<br>    Jacksonville, FL 33202; | ) ) ) ) | |
| Norfolk Southern Railway Company,<br>    Three Commercial Place<br>    Norfolk, VA 23510, *and* | ) ) ) ) | |
| Union Pacific Railroad Company,<br>    1400 Douglas Street<br>    Omaha, NE 68179 | ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Mitsubishi Motors North America, Inc. ("MMNA" or "Plaintiff") alleges against Defendants BNSF Railway Company ("BNSF"), CSX Transportation, Inc. ("CSX"), Union Pacific Railroad Company ("UP"), and Norfolk Southern Railway Company ("NS") (collectively, "Defendants" or "Railroads") based on personal knowledge as to its own acts and practices and otherwise based on information and

belief, the following claim for *per se* violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## I.   Nature of the Action

1.     This is an antitrust action charging the four largest United States-based Class I railroads with price-fixing in violation of Section 1 of the Sherman Act.  Plaintiff purchased unregulated car load rail freight transportation services directly from one or more of the Defendants from July 1, 2003 until at least December 31, 2008 (the "Relevant Time Period") and was assessed a rail fuel surcharge for the agreed-upon transportation. As used herein, the term "unregulated" refers to rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.  Carload refers to freight through a single carrier or container, as opposed to intermodal freight.  Intermodal freight is where freight may be carried through multiple modes of transport and/or shippers by rail, truck and/or boat.

2.     As alleged in detail, Defendants engaged in multiple *per se* antitrust violations of Section 1 of the Sherman act.  The four railroads artificially enhanced rates and resulting revenues by jointly adopting and uniformly imposing a charge on shippers that the railroads called a "fuel surcharge," but which was actually calculated as a percentage of base rates, unrelated to the actual fuel costs the railroads incurred.

3.     The concerted surcharge imposed by Defendants and their co-conspirators increased their revenues far in excess of the railroads' actual costs for fuel.  UP boasted to its shareholders that its revenues from this fuel surcharge were over $1 billion in 2005. In a proceeding denominated Rail Fuel Surcharges, *Ex Parte* No. 662 (Jan. 25, 2007), the

Surface Transportation Board ("STB"), the federal agency now charged with regulating aspects of the railroad industry, addressed the Railroads' practice of computing rail fuel surcharges as a percentage of their base rail freight rate and found their uniform conduct was "unreasonable" and that the practices, invoices, and documents relating to those fuel surcharges were "misleading."

4.　Among those customers who were damaged by the Defendants' price fixing was plaintiff MMNA. During the Relevant Time Period, MMNA paid an overcharge of at least $5 million directly to one or more of the Defendants.  As a direct and proximate result of the price fixing conspiracy alleged herein, Defendants have restrained competition in the market for rate-unregulated carload rail freight transportation services and injured MMNA in their business and property. Plaintiff paid a higher price for unregulated carload rail freight transportation than it would have paid absent the concerted unlawful activity alleged herein.

5.　Plaintiff seeks damages for Rail Fuel Surcharges imposed on carload rail freight shipments made under private transportation contracts and through other means exempt from rate regulation under federal law. Plaintiff does not seek damages or relief arising from fuel surcharges imposed on rate-regulated freight transportation.

II.　**Parties**

6.　Plaintiff Mitsubishi Motors North America, Inc. is a California corporation with headquarters at 4031 Aspen Grove Drive, Suite 700, Franklin, Tennessee  37067. MMNA is the North American subsidiary of Mitsubishi Motors Corporation. MMNA regularly does business within the District of Columbia.

7.     Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF originates and terminates traffic within this District by providing rail transportation in interchange service with CSX and NS. BNSF is a wholly owned subsidiary Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation. BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states, and maintains a government affairs office at 500 New Jersey Ave., N.W., Suite 550, Washington, D.C. 20001.

8.     Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States, including rail lines within this District, and maintains a government relations office at 1331 Pennsylvania Ave., N.W., Suite 560, Washington, D.C. 20004.

9.     Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world. NS operates an intermodal terminal at 1000 S. Van Dorn St., in

Alexandria, Virginia, and maintains a government relations office at 1500 K Street, N.W., #375, Washington, D.C. 20005.

10.     Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is the largest freight railroad in the United States. UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including Washington, D.C.). UP maintains an office at 600 13th Street, N.W., #340, Washington, D.C. 20005.

## III.    Jurisdiction and Venue

11.     This action is brought pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys' fees and costs from Defendants for the injuries sustained by Plaintiff by reason of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

12.     Jurisdiction of this Court is founded on 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

13.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## IV.    Factual Allegations

A. **Rail Industry Background**

14.     The railroad freight industry in the United States has played a central role in the country's economic growth and in the laws designed to foster that growth and protect consumers through competition.  Congress cited the misuse of rail service to stifle competition as one of the main reasons for passing the Sherman Act in 1890.  Lawsuits against the rail industry were some of the cases brought to enforce the Sherman Act.

15.     Between 1887 and 1980, railroad operations in the United States were conducted by a large number of federally-regulated railroads with rates for shipment of freight required to be published in tariffs filed with the Interstate Commerce Commission (the "ICC").

16.     In 1980, Congress sought to introduce competition and market principles into the rail transportation industry.  With the passage of the Staggers Rail Act of 1980 ("Staggers Act"), Pub. L. No. 96-448, 94 Stat. 1985, 49 U.S.C. §10101, *et seq.*, the railroads became free to set rates for rail transportation.

17.     The policy of the Staggers Act is to rely on competitive forces, rather than government regulation, to improve the efficiency of railroad operations.  Among other things, instead of having all rates set in accordance with mandatory tariffs, rail shippers and rail carriers were generally allowed to enter into rail transportation contracts whose terms were not subject to ICC review and approval.  The Staggers Act also phased out across-the-board industry-wide rate increases.  The objectives of the Staggers Act included the creation of a modern, competitive and healthy railroad industry that would serve the American business community, with competitive rates and concern for serving

the customer base, particularly those that depend on rail freight services for the movement of products.  As the House Committee Report for the Staggers act stated with respect to 49 U.S.C. §10709:  "If anticompetitive behavior is alleged, under this section, the antitrust laws are the appropriate and only remedy available."  H.R. Rep. No. 96-1035, 96th Cong. 2d Sess. 1, (1980), *reprinted in* 1980 U.S.C.C.A.N. 3978, 4003.

18.     In 1995, Congress replaced the ICC with a new agency – the Surface Transportation Board ("STB") – which assumed some of the ICC's former functions.

19.     More than 80% of all U.S. rail freight shipments move under terms that are not regulated by the STB or any other government agency.  This case involves such non-regulated rail traffic.

20.     The era between the passage of the Staggers Act in 1980 and the 1995 establishment of the STB saw a dramatic consolidation of the freight rail industry.  Before the Staggers Act, 35 Class I railroads operated within the United States.  ("Class I" railroads are the largest national freight railroads according to annual carrier revenues.) Today, the industry is highly concentrated – only seven Class I railroads operate within the United States.  Of these, the Defendants UP and BNSF (collectively, the "Western Railroads") in the west, and those railroads in the east that combined or conspired with them – CSX and Norfolk (collectively, the "Eastern Railroads") – control the vast majority of rail shipments.  These four Class I Railroads now receive approximately 90% of all freight rail revenue in the United States, leaving a highly concentrated industry with great susceptibility to collusion.

B.    **The Fuel Surcharge Conspiracy**

1.    **Shifting Indices and Collusive Pricing**

21.    Following the passage of the Staggers Act, railroads typically entered into private freight transportation contracts that included cost-adjustment provisions. The adjustment provisions typically relied on a price index called the All Inclusive Index ("AII") or a price index called Rail Cost Adjustment Factor ("RCAF"). The Association of American Railroads ("AAR") – a railroad trade organization that the four major Railroads control and dominate – publishes the AII, and the STB publishes the RCAF. As the name "*All Inclusive* Index" suggests, the AII and RCAF weighted a number of price inputs, labor, fuel, materials and supplies, equipment rents, depreciation, interest and other expenses, so that the index would reflect the actual impact of particular price increases on overall rail transportation costs. This meant that the AII and RCAF would capture any actual increase in fuel prices, no matter how insignificant. In fact, James R. Young, the President of UP, acknowledged publicly that the RCAF "looks at actual costs through the industry."

22.    Prior to 2003, some of the Railroads attempted to impose fuel surcharges on rail freight transportation. But the Railroads' application of these surcharges was neither uniform nor consistent, and each Defendant had different fuel surcharge formulas.

23.    In 2003, the Defendants and the Railroads conspired to use fuel surcharge formulas as the means to create an across-the-board rate increase. Defendants conspired to overcome the obstacle that fuel cost increases were already accounted for in the AII and RCAF. They did this by embarking on a scheme to remove the fuel component from

the AII, to refuse to use the RCAF in contract rate adjustment formulas, and to apply a brand new index combined with a "fuel surcharge" to adjust rail rates.  This scheme allowed the railroads to pretextually label across-the-board price increases as a "fuel surcharge" to recover increased fuel costs, when what they were actually doing was simply raising total freight prices by a given (and agreed upon) percentage that was the product of conspiracy.  The pretextual fuel surcharge was not based on actual cost.

24.     The Defendants and those acting in conspiracy with them adopted this "fuel surcharge" through a series of coordinated actions using a common organization. Top executives of the Railroads met frequently, including at the biannual meetings of the National Freight Transportation Association and at AAR board meetings, to discuss "industry developments."   The AAR was a particularly potent tool to coordinate and monitor a conspiracy because: (i) the Chief Executive Officers of the four Railroads constitute four members of the AAR's Board of Directors; (ii) the AAR Board of Directors meets regularly and its members regularly communicate between meetings; (iii) many former AAR employees and staff members are now employed by Class I railroads; and (iv) the AAR publishes the AII.

25.     At the Spring 2003 meeting of the AAR, and in the months that followed, executives of the four Railroads conspired on a plan to use a new type of ostensible "fuel surcharge."

26.     The plan began with the Western Railroads, UP and BNSF, as part of their joint plan to reduce competition and increase revenues and profits.  Prior to April 2003, BNSF had assessed a fuel surcharge based on the actual miles that freight traveled.  In

April 2003, a BNSF executive called a UP executive and asked if he had "heard anyone charging a fuel surcharge in miles," and the following month, BNSF abandoned a mileage-based program.

27.     UP and BNSF then conspired to use the same industry fuel index for new fuel surcharge formulas that calculated a surcharge as a percentage of the base rail transportation rate.  Previously, they had used fuel surcharges for a minimal portion of their contracts and adjusted their respective fuel surcharges using different indexes.  UP had calculated its fuel surcharge based on the West Texas Intermediate ("WTI") Index; BNSF based its surcharge on the U.S. Department of Energy On-Highway Diesel Fuel Price ("HDF") Index.  In or about July 2003, however, pursuant to their agreement, UP suddenly switched to the HDF Index for calculation of its fuel surcharges.  UP made this sudden switch even though, only three months earlier, it had demonstrated its commitment to the WTI Index by undertaking modifications to surcharges based on that index.

28.     UP and BNSF also conspired to apply the HDF Index in the same way.  They selected "trigger" points that operated to impose identical rail fuel surcharges on shippers.  Although UP and BNSF ostensibly used different thresholds as "trigger points" ($1.35 for UP and $1.25 for BNSF), this difference had no practical effect.  The UP and BNSF fuel surcharge programs provided for identical fuel surcharges once the $1.35 threshold was reached – and, in practice, that threshold was always exceeded.  UP and BNSF both increased the surcharge by 2% for every twenty-cent increase in the HDF

Index above $1.35 per gallon.  Beginning in July 2003, BNSF and UP made their standard rail fuel surcharges identical.

29.    UP and BNSF coordinated the timing of their fuel surcharges.  They each applied the rail fuel surcharge to shipments beginning in the second month after the month in which there was a change in the HDF Index average price calculation:  if the average price changed in January, UP and BNSF would announce their new fuel surcharge percentage on February 1 and then apply the surcharge to shipments in March.  Defendants published their monthly fuel surcharge percentages on their websites to enforce against deviation from the pricing conspiracy.

30.    UP and BNSF thus simultaneously selected and adopted the same novel, arbitrary and complex combination of features for their rail fuel surcharges, including using the same HDF Index, setting functionally identical trigger points and applying the surcharge at the same time after the HDF Index price had changed.  UP and BNSF adopted this common pricing despite the fact that their rate and cost structures, customer bases, fuel sources, fuel costs, and their relationship with the rail rate were different.

31.    The chart attached hereto as Exhibit A reflects the absolutely lock-step standard carload fuel surcharges that the Western Railroads, UP and BNSF, applied for the next several years.

32.    Even after conspiring to coordinate fuel surcharges, however, UP and BNSF still had to address a significant barrier to widespread application of the fuel surcharge to raise rail rates.  Most contracts contained rate adjustment provisions that utilized periodic changes in the AII or the RCAF, both of which accounted for changes in fuel

costs, when adjusting rates over a contract term.  This left no objective basis for a separate and additional fuel surcharge.

33.    In the fall of 2003, UP and BNSF commenced an effort to get the two Eastern Railroads to conspire on a fuel surcharge program so as to enable the Railroads not to use the RCAF to adjust rail rates, to use instead of the fuel surcharges calculated as a percentage increase of the base rail transportation rate, regardless of actual fuel costs.  At AAR meetings in late 2003, including October 2-3 and December 11-12, the Railroads conspired to create and implement coordinated fuel surcharge programs.

34.    Through combination or conspiracy by the Railroads, which collectively dominate the AAR and its board, the AAR developed and announced in December 2003 a new index that did not include fuel costs.  That index, known paradoxically as *All-Inclusive Index **Less Fuel*** ("AII-LF"), was similar to the AII and RCAF but excluded a component for changes in fuel costs.  The announcement of the AII-LF, and the underlying decision to create the new index, was a product of the collective action of the Defendants and those acting in conspiracy with them.  The AII-LF specified the fourth quarter of 2002 as its base period.

35.    Never before in its nearly 60-year history had the AAR separated out fuel costs from the AII index, and the STB-published RCAF still contains a fuel cost component.  The railroads did not decide it was appropriate to exclude fuel from the index in 1979, when the law still allowed common rate-setting based upon costs and the Arab Oil embargo pushed domestic crude prices to their all-time inflation-adjusted high of more than $99/barrel in 2010 dollars.  The railroads did not do so in 1998, when crude

oil prices had dropped to $16/barrel by the same measure.  They did not do so in 2000, when prices had more than doubled to almost $35/barrel by that measure.

36.     The Railroads planned to create a new index without a fuel cost component not because it better *tracked* their costs than the prior indexes; but because it did *not*. Moreover, they decided to use this new index in combination with pretextual "fuel surcharges" to conceal their conspiracy to impose price increases across the board without regard to recovering actual fuel costs.  The Railroads chose a method for calculating rail fuel surcharges that did not correspond with actual or unanticipated increases in fuel costs.  The AII and RCAF, in contrast, had been "weighted" to reflect the relative impact of fuel costs as compared to other cost factors.  Following publication of the AII-LF, the Western Railroads and the Eastern Railroads uniformly applied rail fuel surcharges using the "base rate" method.  This method calculated rail fuel surcharges as a percentage of the total rate charged for the freight shipment, regardless of how much fuel contributed to costs, or whether the particular trips used more fuel or less.  This made the new "base rate" method a *less* accurate fuel cost recovery method than the methods that the industry had previously used for decades.  These conspiratorial fuel surcharges were applied to shipments of all kinds, including shipments by MMNA.

37.     Just as UP and BNSF had conspired to operate in lockstep based on the HDF Index, the Eastern Railroads also moved in lockstep with their "fuel surcharges" based on the WTI Index.  They each conspired:  (i) to apply a "fuel surcharge" whenever the monthly average WTI price exceed $23 per barrel crude oil; (ii) to charge a "fuel surcharge" of 0.4 percent for every $1 above the monthly average WTI price of $23 per

barrel; (iii) to time the "fuel surcharge" in the same way; and (iv) to publish their monthly fuel surcharge percentages on their websites to enforce against deviation from such pricing.

38.     The Eastern Railroads thus also simultaneously selected and adopted the same novel, arbitrary and complex combination of features for their rail fuel surcharges, in this case using the same WTI Index, setting the same trigger point and applying the surcharge at the same time after the WTI Index price had changed.

39.     The chart attached hereto as Exhibit B reflects that the Eastern Railroads, CSX and NS, like their Western counterparts, imposed the identical fuel surcharge month after month for years.  The Railroads also declined to undercut one another on fuel surcharge prices, even though the surcharges far exceeded each railroad's actual increase in fuel costs.

40.     The four Railroads conspired not only to charge illegal fuel surcharges, but also to use the same cover story.  Following AAR's publication of the AII-LF, the Railroads all began to apply rail fuel surcharges as separate billing items on shipping bills.  The Railroads also all inaccurately represented the rail fuel surcharges to be charges they imposed merely to account for unanticipated increases in fuel prices.  In fact, these charges did not merely account for fuel costs; they were a rate increase.

41.     The Railroads coordinated and enforced their rate-based fuel surcharges.  For instance, in November 2004, a BNSF executive "shopped the concept" of a mileage-based fuel surcharge with his counterparts at the other railroads, and they "pushed back, as expected."  The following year, in an internal assessment, BNSF recognized that its

hugely profitable fuel surcharge program depended upon no one deviating from the plan: "While fuel surcharges are working well now, it would only take one competitor to abandon this in an attempt to gain market share to cause this to fail."

42.     The "convergence" in rail fuel surcharge methodologies and prices among railroad competitors raised concerns of industry experts.  At the time, one analyst concluded that the fuel surcharges were "not supported" by fuel cost increases and found it odd that "the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives," as a "way to gain significant market share."  An independent 2007 study commissioned by the American Chemistry Council and Consumers United for Rail Equity found an over $6 billion discrepancy between the Railroads' rail fuel surcharge revenue and their publicly reported fuel costs between 2003 and 2007.  A 2010 joint report by the United States Department of Agriculture and Transportation, titled Study of Rural Transportation Issues, similarly found:  "There is considerable evidence that railroad fuel surcharges recovered more than the additional cost of fuel, artificially boosting railroad profits.  From 2001-2007, surcharges were 55 percent higher than the incremental increase in the cost of fuel."

43.     There was no business or other procompetitive reason why UP, BNSF, CSX and Norfolk would collectively adopt and publish the AII-LF.  The AII and RCAF had been appropriately "weighted" to reflect the relative impact of fuel costs as compared to other cost factors.  Reworking the index to operate "less fuel (LF)" and substituting a pretextual "fuel surcharge" formula that would be applied to the entire base rate, ensured

that the formula would drive rate increases far out of proportion to the actual increases in fuel costs for the relevant rail movement.

44.    In a competitive environment free of unlawful collusion, carriers with lower fuel costs would negotiate a fuel cost adjustment provision that closely traced actual costs in an effort to compete for additional business and revenues and increased shares of the business.  However, starting in 2003, the Railroads uniformly refused to negotiate any changes to their surcharge formulas even when doing so would have allowed them to capture additional business, revenue and market share.  Each Railroad instead restricted its freedom to price competitively and adhered to an industry-wide pattern of uniform fuel surcharge pricing based on a percentage of the base transportation rate.  The Railroads did not compete with one another for sales but instead collectively maintained the artificially-high fuel surcharges.

45.    If the Railroads had wanted to recover actual fuel costs efficiently and accurately, they would never have adopted uniform percentages applied to the base rate. Actual fuel cost as a percentage of operating cost and fuel efficiency differs widely among the railroads and individual rail movements.  Thus, absent conspiracy, it is inconceivable that the four Railroads would each independently design their fuel surcharges to arrive at the identical percentage month after month, for a period of more than three years.  The only way to achieve uniform pricing of fuel surcharges (and especially to achieve a pricing that exceeds actual anticipated rises in fuel costs) was by a conspiracy to decouple fuel prices from the historical railroad cost indices and to then conspire to create new

uniform indices and trigger points for computing the resulting stand-alone fuel surcharge percentages.

46.     Even within a particular railroad, actual fuel costs for routes and trains vary.  A uniform fuel rate applied as a percentage of base rates is inefficient because it taxes routes based upon the rates that the railroad has been charging for them, rather than the amount of fuel the routes require.  Accordingly, a percentage surcharge forces MMNA to pay more simply because it was paying more already, regardless of the amount of fuel required by the trip.

47.     The rail fuel surcharges also did not correspond with the variation of fuel prices affected by free-market influences.  They did not take into account the "hedging" activities of some of the railroads that affected the actual fuel costs incurred.  Nor did they account for the phase-out in the railroad diesel fuel tax that occurred between 2004 and 2007.

48.     The Railroads' actions thus were not an independent response to a common problem of increasing actual fuel costs.  The only purpose in taking these collective actions was to assess a stand-alone fuel surcharge designed to substantially increase revenues rather than recover actual fuel costs, to act illicitly in concert with one another to set the surcharge and demand them from shippers and customers, and to ensure collective enforcement of the conspiratorial program.  The rail fuel surcharges were intended to achieve – and did achieve – across-the-board profits and increases in the prices the Railroads charged for unregulated rail freight shipments.

49.    By conspiring on rail fuel surcharges, each railroad was acting against the independent business self-interest it would have had absent the conspiracy.   In a competitive environment free of combination and conspiracy, carriers with lower fuel costs would impose a lower rail fuel surcharge.  That way, they could take business from less efficient competitors.  It was the combination and conspiracy not to compete that made the uniform, rate-based fuel surcharges an effective strategy.

50.    The Railroads also collectively changed aspects of their pricing and other behavior to advance the conspiracy.  Prior to adopting the base rate method, the Railroads had allowed long-term contracts of five years or more with clauses based on the AII, RCAF and other indices that bore a close nexus to the actual fuel costs associated with handling the traffic.  After the Railroads announced the AII-LF, the Railroads resisted entering into long-term contracts with shippers and instead entered into contracts for much shorter time periods, making it easier to implement the fuel surcharges.

51.    The Railroads forced customers to abide by the new rate adjustment method even though most shippers, including MMNA, preferred the system in place before 2003 that provided for long-term contracts that allowed shippers to ascertain their costs and operating expenses with considerable certainty.  In a competitive market, at least some railroads would see a benefit in long-term contracts, because they allow railroads to lock in customers and minimize risks in fluctuating demand.

52.    BNSF, UP, CSX and Norfolk also took other collective actions to enforce the conspiracy and make it more effective.  For example, pursuant to the conspiracy, they limited the previously prevailing practice of sending a customer a single invoice for the

entire transport in circumstances where more than one railroad (usually an Eastern and a Western Railroad) was involved in long-distance freight transport. Instead, the Railroads, pursuant to the conspiracy, increasingly switched to having each railroad on a multi-railroad trip send a separate invoice (and thus each could separately impose its own fuel surcharge). This practice also made it easier for each railroad to recoup its share of the supra-competitive profits from the fuel surcharge program imposed by the conspiracy.

### 2.    The Result: Supra-Competitive Profits

53.    Defendants and those who conspired with them reaped huge, supra-competitive profits as a result of the success of their conspiracy. Through their conspiracy to coordinate on fuel surcharges, the Railroads realized billions of dollars in revenues in excess of their actual increase in fuel costs from the customers on whom they imposed the surcharge. As the head of UP, James Young, admitted in 2007, "three, four years ago [the Rail Fuel Surcharges] were really non-existent" and "it's only been the last couple of years" that "the financial returns in the business has [sic] started to move in the right direction."

54.    Thus, although fuel prices increased between 2003 and 2008, the Defendants and those who conspired with them continued to realize increasing profits each year of the conspiracy. The report commissioned by the American Chemistry Council estimated that between 2005 and 2007, UP's fuel surcharge formula alone produced $13.69 billion in revenues over and above UP's actual fuel costs.

### 3.    Additional Elements of the Conspiracy

55.    At or about the time the Defendants agreed to fix the Rail Fuel Surcharge prices, the Defendants also took other steps in furtherance of the conspiracy. They largely switched from offering long-term contracts (the terms of which were secret) to offering contracts that were "re-priced" as often as monthly.  Previously, Defendants had allowed, and often preferred, long-term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point, usually governed by the AII or RCAF, or that excluded fuel surcharges altogether.

56.    This collective movement away from long-term contracts meant that Defendants no longer offered discounts to increase market share and their pricing became more visible to each other.

57.    Defendants made this switch even though more shippers preferred the former system in order to minimize risk and make costs more predictable.  In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business.  Here, all Defendants raised prices and did not offer any compensation to customers for assuming additional risk.  Similarly, in a competitive market, one would expect that the railroads would seek, as they had in the past, to reduce their own risks and lock in market share by entering into long-term contracts.  The Defendants, however, collectively refused to offer long-term contracts and took no steps to minimize their own risks from fluctuations in demand.  This coordinated behavior was hardly routine market conduct.

58.     In furtherance of the conspiracy, Defendants also declined to negotiate discounts on the Fuel Surcharges and overall contract rates, even though prior to mid-2003 it had been customary for the Defendants at least to entertain such negotiations. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Defendants (who had previously been willing to negotiate discounts on rail freight rates) that the Rail Fuel Surcharges were "not negotiable."  By way of example, during the relevant period the Archer-Daniels-Midland Company ("ADM") approached individual Defendants to discuss hedging opportunities to allow ADM and the railroads certainty and a method for cost-containment.  The railroads, acting against their own individual interests, refused to enter into hedging contracts with ADM.

59.     In addition, several national shipper organizations met with each of the Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges.  Among the Defendants, only BNSF agreed to make responsive changes to its surcharge program, and that was only for grain and coal shipments coming from certain regions where BNSF is the only carrier.  That is, BNSF reduced fuel surcharges on traffic where it faced no competition from the UP, and thus would not violate the agreement to fix competitive prices.  The other Defendants refused to address the concerns of their customers.

60.     Defendants also agreed that none of the conspirators would be undercutting agreed pricing or "stealing" market share by using their increasing

revenues to subsidize discounting of underlying rates.  As demonstrated in the table that follows, Defendants' market shares remained stable following the 2003 agreements.

61.     On January 25, 2007, the STB issued an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rate for rate-regulated rail freight transport was an "unreasonable practice," because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied.  *Rail Fuel Surcharges*, STB *Ex Parte* No. 661 (Jan. 25, 2007).

62.     The STB's decision addressed rate-regulated rail freight traffic only (which is not the subject of this Complaint).  The STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.

63.     Pursuant to their conspiracy, Defendants applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

**C.     STB and Other Government Investigations**

64.     On January 25, 2007, the STB concluded its investigation.   Rail Fuel Surcharges, STB *Ex Parte* No. 661 (Jan. 25, 2007).  The STB concluded:

> [I]mposing rate increases in this manner, when there is no real correlation between the rate increase and the increase in fuel costs for the particular movement to which the surcharge is applied, is a misleading and ultimately unreasonable practice.  *Id*. at 7.

65. The STB also determined that the term "fuel surcharge" used by the Railroads was itself deliberately misleading:

> The term 'fuel surcharge' most naturally suggests a charge to recover increased fuel costs associated with the movement to which it is applied. *If it is used instead as a broader revenue enhancement measure, it is mislabeled.* This sort of mislabeling appears designed to avoid the type of response a carrier would likely receive if it were to honestly inform a shipper that a higher rate was being imposed to recover not only the increased cost of fuel for another shipper's traffic – which is what would often occur under rate-based fuel surcharges. *Id.* at 6-7 (emphasis added).

66. Pursuant to the conspiracy, the Defendants and those who conspired with them continued to apply the same unreasonable fuel surcharge practices addressed by the STB by insisting on a "take it or leave it" basis that these formulas be included in the private rail freight transportation contracts, and other unregulated freight transport, at issue here. These misleading and unreasonable practices removed competitive constraints and raised shipping costs for shippers, such as MMNA.

**D**. <u>**Antitrust Plus Factors**</u>

67. Antitrust "plus factors" further support the allegation that Defendants agreed to fix prices for Rail Fuel Surcharges. The rail transportation industry is marked by certain structural and other characteristics that make a price-fixing cartel feasible.

68. <u>The railroad industry is highly concentrated</u>. The Railroad Defendants in this case are the four largest remaining domestic Class I railroads following decades of mergers and consolidation. The Railroad Defendants account for more than 90% of the nation's rail freight traffic. Such high concentration facilitates the possibility of a price-fixing cartel.

69.     <u>There are significant barriers to entry into the railroad industry</u>.  In order to compete, railroads must invest in a vast network of rail tracks, stations, yards, and switching facilities.  Such infrastructure takes decades to develop and requires onerous regulatory and environmental reviews and approval.  Land or easements are often needed, necessitating the involvement of multiple local governments and the exercise of the power of eminent domain.  Because rail infrastructure is of minimal value for other purposes, and rail networks are difficult to assemble, the fixed costs are largely sunk, creating significant entry barriers.  Entry also requires that a new entrant capture a significant market share from existing carriers.  Entry is thus both expensive and risky.

70.     <u>The Rail Fuel Surcharges were highly standardized</u>.  The Railroad Defendants structure their Rail Fuel Surcharges as a percentage of base rates and then published the percentages on their websites so the colluding railroads could police the conspiracy without frequent communications.  It is well recognized that markets having uniform and homogenous products or services are susceptible to price-fixing.

71.     <u>The railroad industry has a history of price-fixing and other anticompetitive behavior</u>.  In the first antitrust case dealing with the railroad industry, *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290 (1897), the railroad cartel argued that it must fix prices or the industry would go bankrupt.  Prior to deregulation, railroads engaged in open price-fixing through establishment of "rate bureaus" and "rate-making committees."  Although these bodies disappeared from public view after deregulation, the railroad industry has continued to engage in market manipulation, unreasonable rate

practices, and other discriminatory practices against a wide spectrum of freight customers.

72.     The CEOs of the Railroad Defendants are all board members of the AAR, which facilitates transfer of pricing information.  The AAR describes itself as "the central coordinating and research agency of the North American rail industry."   Full membership, however, is available only to Class I railroads operating in the United States, four of which are Defendants in this action.  The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.  AAR meetings and events provide opportunity for the Railroad Defendants to discuss and agree upon a common course of action with respect to Rail Fuel Surcharges.

73.     Defendants acted in contravention of their individual economic interests. The Railroad Defendants did not behave as if they were in a competitive market and each acted in a manner contrary to its independent economic interest in a manner that is inexplicable unless there was a conspiracy.

74.     Defendants failed to compete on the Surcharges.  In a truly competitive market, rational railroads levying surcharges based on a percentage of a customer's freight rate – bearing no relation to the actual costs of fuel consumed and therefore not actually crucial to cost recovery – would compete on the basis of surcharges in order to lower a customer's overall bill and thereby gain business and market share.  Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but the Railroad Defendants refused to do so.

75.   <u>Defendants' behavior alienated customers</u>.   At or about the time the Railroad Defendants agreed to fix the Rail Fuel Surcharge prices, they largely switched from offering long-term contracts to offering contracts that were "re-priced" in new negotiations semi-annually, quarterly or monthly.   The Defendants made this switch even though most shippers preferred the former system.   In a competitive environment, offering customers less attractive terms would cause customers to seek competitive alternatives.   Here, Defendants withdrew the offer of the preferred terms and each one of them declined to offer the preferred terms to customers in an effort to increase its market share.   This behavior gives rise to an inference of conspiracy

76.   <u>Defendants changed billing practices to expose each other's prices</u>.   The Defendants sometimes stopped offering "through rates," in which a shipper would receive a single bill from either the originating shipper or the termination railroad and a single fee would be allocated among the railroads that shipped.   Instead, the Defendants moved to what is known in the industry as "Rule 11 pricing."   Under Rule 11 pricing, where a shipment requires movement on more than one carrier, the two rates are stated separately rather than as one quote for the entire shipment. The Defendants declined to issue one bill for two reasons:  (1) to provide transparency as to what each railroad was charging on multiple-line shipments and (2) to allow each railroad to apply the agreed-upon Rail Fuel Surcharge in its own territory.

77.   <u>During the Relevant Time Period, rail freight demand grew, but each Defendant's market share remained stable</u>.   Finally, demand for rail freight transportation services grew substantially during the period of the conspiracy, but the

Defendants' market shares remained relatively stable and constant. The fact that market shares did not fluctuate significantly during a period of demand growth is further indication that the Defendants agreed to price-fix rather than to compete for new and increasing sales.

E.       **Antitrust Injury to Plaintiff**

78.     The unlawful conduct, combination or conspiracy alleged herein had the following effects, among others:

a. The Rail Fuel Surcharges charged to MMNA for unregulated carload rail freight transportation were fixed or stabilized at supra-competitive levels;

b. Plaintiff was deprived of the benefits of free, open and unrestricted competition in the market for unregulated carload rail freight transportation; and

c. competition in establishing the prices paid in the United States for unregulated carload rail freight transportation was unlawfully restrained, suppressed and eliminated.

79.     By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff has sustained injury to business or property. The injury sustained by Plaintiff is the payment of supra-competitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation throughout the United States as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged. This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

F.       **Interstate Trade and Commerce**

80.     During the Relevant Time Period, Defendants accounted for over 90% of all rail shipments within the United States. The AAR Policy and Economic Department

reported that railroad total operating revenue in the United States in 2006 exceeded $52 billion.

81.     The activities of Defendants and their co-conspirators were within the flow of, and substantially affected, interstate commerce.  During the Relevant Time Period, Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States.  Each Defendant and its co-conspirators used instrumentalities of interstate commerce to sell and market rail freight transportation services.

82.     The unlawful activities of Defendants have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## V.     Tolling of Statute of Limitations

83.     The filing of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action. *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974); *Crown v. Parker*, 462 U.S. 345, 350 (1983). The mere fact that a federal statute providing for substantive liability also sets a time limitation upon the institution of suit does not restrict the power of the federal courts to hold that the statute of limitations is tolled under certain circumstances not inconsistent with the legislative purpose. *American Pipe*, 414 U.S. at 559. A class complaint notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment. *Id*. at 555. The defendants will be aware of the need to preserve evidence and witnesses respecting the claims of all the

members of the class. Tolling the statute of limitations thus creates no potential for unfair surprise, regardless of the method class members choose to enforce their rights upon denial of class certification. *Crown v. Parker*, 462 U.S. 345, 352-353 (1983). Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied. At that point, class members may choose to file their own suits. *Id*. at 354.

84.     On May 14, 2007, a first class action suit (*Dust Pro, Inc. v. CSX Transportation, Inc., et al.*, D.N.J., 2:07-cv-02251-DMC-MF) ("*Dust Pro*") was filed against the Defendants and others on behalf of a class that included direct purchasers of unregulated rail freight transportation services from the Defendants and others from July 1, 2003 until at least May 14, 2007 and who were assessed a rail fuel surcharge for the agreed-upon transportation, alleging that the Defendants conspired to use rail fuel surcharges, which were added to customers' bills, as a means to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States

85.     On November 6, 2007, the Multidistrict Litigation Panel consolidated all 18 pending actions, including *Dust Pro*, before the District of District of Columbia under the caption *In Re: Rail Freight Fuel Surcharge Antitrust Litigation* (see D.D.C., 1:07-mc-00489-PLF, ECF No. 1).

86.     In 2012, the district court had initially certified the direct purchaser class. (*See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1 (D.D.C. 2012). However, on appeal, the United States Court of Appeals for the District of Columbia Circuit vacated

the certification and remanded for further consideration. (*In re Rail Freight Surcharge Antitrust Litig. MDL No. 1869*, 725 F.3d 244 (D.C. Cir. 2013).

87.     On October 10, 2017, on remand and after permitting supplemental discovery and expert reports, the district court **denied** class certification of the direct purchaser class (*In re Rail Freight Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14 (D.D.C. 2017) and direct purchaser plaintiffs subsequently appealed to the Court of Appeals. Normally, a district court's denial of class certification ends the tolling of the applicable statute of limitations.

88.     However, on November 8, 2017—during the pendency plaintiff's Rule 23(f) Petition to the Court of Appeals—the district court entered a first Order staying the case until the earlier of (1) denial of Plaintiffs' Petition by the Court of Appeals, or (2) January 5, 2018 and further stated that:

   It is not necessary for the Court to address at this time Plaintiff's request for tolling, because Defendants have agreed, for claims previously tolled by the pendency of the class action, to exclude from future statutes of limitations calculations the time between (i) the date of the court's order denying class certification and (ii) the earlier of either the date when the pending Rule 23(f) Petition may be denied or January 5, 2018, for actions filed after the date in clause (ii).

89.     On December 20, 2017, the Court of Appeals granted Plaintiff's Rule 23(f) Petition. *In re Rail Freight Surcharge Antitrust Litig.*, Case No. 17-8005 (D.C. Cir.), ECF No. 1709931.

90.     On January 8, 2018—during the pendency of the appeal—the district court entered a Stipulation and Second Order on Plaintiff's Motion for a Stay of Proceedings

and to Toll The Statute of Limitations (*see* D.D.C., 1:07-mc-00489-PLF, ECF No. 856)

pending the appeal of the direct purchaser class pursuant to Fed. R. Civ. P. 23(f). The

Stipulation and Order states in pertinent part:

> The Court again acknowledges Defendants' representation regarding
> future statute of limitations calculations and, on the basis of that
> representation, again concludes that it is not necessary at this time to decide
> (1) whether to enter an order extending tolling under the *American Pipe*
> doctrine beyond the date of the Court's order denying class certification,
> see *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974), or (2) whether
> the Court has the power to enter such an order.

> Now, therefore, the Court ORDERS as follows:

> Plaintiffs need not renew their request for tolling at this time because
> Defendants have agreed, for claims previously tolled by the pendency of
> the class action, to exclude from future statutes of limitations calculations
> the time between (i) the date of the court's order denying class certification
> and (ii) the date that the Court of Appeals issues its merits-panel decision
> on Plaintiffs' appeal, for actions that are filed after the date in clause (ii).
> This determination is without prejudice to Plaintiffs renewing their request
> at a future date.

*Id.* at 3.

91.     On August 16, 2019, the Court of Appeals affirmed the district court's 2017

denial of class certification. *In re Rail Freight Surcharge Antitrust Litig.*, Case No. 18-7010

(D.C. Cir.), ECF No. 1802468.

92.     On September 17, 2018—still during the pendency of the appeal—the

district court entered an Order on Joint Proposal Regarding a Stay (*see* D.D.C., 1:07-mc-

00489-PLF, ECF No. 869). Stipulation and Order states in pertinent part:

> [I]t is hereby ordered that all proceedings in Miscellaneous Case No. 07-
> 0489 are STAYED until forty-five (45) days after the D.C. Circuit's ruling on
> the pending appeal of this Court's Order denying class certification. On or

before the date on which the stay expires, the parties shall submit a status report and recommendation(s) concerning further proceedings.

93.     Accordingly, the period between October 10, 2017 (the date of the district court's order denying class certification) and August 16, 2019 (the date that the Court of Appeals issued its decision to affirm the district court's denial of class certification) must be excluded from the statutes of limitations calculation for individual actions—such as this—that are filed after August 16, 2019. In addition, the stay entered in *In re Rail Freight Surcharge Antitrust Litig.* expired on September 30, 2019.

## <u>COUNT I</u>

### **(Violation of Section 1 Of the Sherman Act And Section 4 Of The Clayton Act)**

94.     Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

95.      Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

96.     The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

97.     Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between and among Defendants.

98.     The contract, combination or conspiracy has had the following effects:

a. Prices charged to Plaintiff for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supra-competitive levels;

b. Plaintiff has been deprived of the benefits of free, open and unrestricted competition in the market for rail freight transportation services; and

c. Competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed and eliminated.

99.     As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered injury in that it has paid supra-competitive prices for Rail Fuel Surcharges applied to unregulated carload rail freight transportation services during the Relevant Time Period.


WHEREFORE, Plaintiff prays for relief as follows:

(1) That the unlawful contract, combination and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(2)  That Plaintiff recover compensatory damages, as provided by law, determined to have been sustained by it, and that judgment be entered against Defendants on behalf of Plaintiff;

(3) That Plaintiff's damages be trebled, as provided by law;

(4) That Plaintiff recover the costs of the suit, including reasonable attorneys' fees, as provided by law; and

(5) That Plaintiff be granted such other and further relief as the Court may deem just and proper.

**<u>Jury Trial Demand</u>**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the

claims asserted in this Complaint so triable.

Dated: September 22, 2020                         Respectfully submitted,

                                                 */s/  Joseph M. Vanek*
                                                 Paul E. Slater
                                                 Joseph M. Vanek
                                                 David P. Germaine
                                                 Matthew T. Slater
                                                 Martin V. Sinclair, Jr.
                                                 SPERLING & SLATER, P.C.
                                                 55 West Monroe Street, Suite 3200
                                                 Chicago, IL 60603
                                                 Tel: (312) 641-3200
                                                 Fax: (312) 641-6492
                                                 pes@sperling-law.com
                                                 jvanek@sperling-law.com
                                                 dgermaine@sperling-law.com
                                                 mslater@sperling-law.com
                                                 msinclair@sperling-law.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 22, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record registered for electronic filing.

<u>/s/  Joseph M. Vanek</u>